Filed 6/16/15  P. v. Castaneda CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>EDDIE CASTANEDA,<br><br>        Defendant and Appellant. | A139113<br><br>(Contra Costa  County<br>Super. Ct. No. 51218908) |

Defendant Eddie Castaneda got behind the wheel of a car after he had been drinking and was involved in a motor vehicle collision.  After the collision, defendant got out of his car and assaulted the other driver, a 58-year old woman, in front of her 10-year old grandson.

A jury convicted defendant of driving under the influence causing injury (Veh. Code, § 23153, subd. (a)), driving with .08 percent blood alcohol level (Veh. Code, § 23153, subd. (b)), assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), and misdemeanor battery (Pen. Code, §§ 242, 243, subd. (a).)  The jury also found true the allegation that defendant had a blood-alcohol level of .15 percent or more (Veh. Code, § 23578) and made a special finding that the victims suffered injuries as a result of defendant driving under the influence.  The trial court sentenced defendant to a prison term of two-years eight-months.

On appeal, defendant claims reversal is required because the trial court improperly discouraged a defense witness from testifying.  He also claims that his assault conviction must be reversed because it is a lesser included offense of battery.  Alternatively,

1

defendant asserts that if the assault conviction is not vacated, it must be stayed under Penal Code section 654. We affirm.

## I. EVIDENCE AT TRIAL

### A.    *Prosecution's Case*

On the evening of December 19, 2011, at about 10:00 p.m., Linda Flynn was driving on 10th Street in Antioch. Flynn's 10-year old grandson, Matthew, was in the front passenger seat. They were travelling west on 10th Street, which had no stop signs or lights between A and G Streets. Defendant, who was driving south on E Street, failed to stop at the intersection with 10th Street. Defendant's car came across 10th Street and collided with Flynn's car. Both the driver and passenger side airbags in Flynn's car deployed on impact. Flynn slid and slammed her knee against the dash under the steering column. Her car was smoking and she could not see out of the windows. Flynn was concerned that the car was on fire and told her grandson to hurry and get out. Flynn had a hard time getting her seatbelt unbuckled. Her thumb hurt very badly, which she later learned had been broken in two places. Flynn's car was "totaled."

Flynn testified that the other car was "ramming backwards and took off down the street," ending up at the corner. Flynn saw defendant get out of the driver's side of the car and jog towards her. She thought he was coming to ask her how she was doing. She asked defendant, "Are you okay?" Defendant did not respond, but instead "socked" her in the head and jaw two or three times. Flynn flew backwards, falling on the street. Defendant then continued hitting her with a closed fist while Flynn tried to block the blows. Flynn asked defendant, " 'What are you doing? . . . This is all your fault, not mine.' " Defendant walked away.

Flynn said that an "ex-fireman" came by and asked her what had happened. She told him, " 'That guy right there, he just knocked the hell out of me.' " Flynn's neck and back began to hurt. People from the area came out of their houses and someone had called the police. When the police arrived, Flynn told them what had happened. They walked her to the curb and she identified defendant as the person who had attacked her.

2

Flynn was placed on a board and transported by ambulance to the hospital where she was given a shot for pain. Her foot hurt badly and her toenail was almost completely ripped off. She suffered an impact fracture to her left knee and could not bend it. Her thumb, which was broken in two places, was swollen, and she had severe pain in her lower back. Flynn underwent six or seven months of follow-up care, including occupational therapy.

Matthew Flynn, who was 12-years-old at the time of the trial, recalled the night of the accident. He was in the passenger seat of his grandmother's car when another car came from the right without stopping and they crashed into it. He was wearing a seat belt. After the crash, Matthew could not feel his legs, his back hurt, and he got whiplash. Matthew got out of the car and went to his grandmother who was getting out of the car on the driver's side. Matthew saw defendant get out of the other car, run over to his grandmother, and start beating her up. Matthew was scared. His grandmother yelled and fell when the man punched her. Even after she fell, defendant kept punching her with his fists. Matthew ran down the street to seek help.

When the police arrived, they talked to Matthew and showed him a man who was passed out. Matthew identified the unconscious man as the person who beat his grandmother. Matthew told police he did not know which door defendant had exited the car. However, he testified that after thinking about it, he subsequently recalled that defendant came out of the driver's door.

Roland Dieck was in Antioch on December 19, 2011, when he drove by the collision. Dieck had emergency medical technician and paramedic training, so he stopped to help. When he got out of his car, he heard a lady screaming, " 'He's hitting me.' " She was holding her jaw and had a bloody nose. The woman's grandson also was present. Dieck ran over to Flynn's side of the car. He did not see Flynn being hit, but there was a man near her who was drunk and belligerent. That man swung at Dieck but missed; Dieck pushed him to the ground. The man vomited and had a hard time standing. The man tried to stagger away, but Dieck made him and a female passenger from his car sit on the curb to wait for the police. The female passenger and another passenger were

3

trying to get the man off the ground. When the police arrived, Dieck identified defendant as the man who had confronted him. Dieck believed there had been four or five people in the man's car. He saw one of those men get out of that car and run down the road away from the accident scene. Dieck just saw the back of the man. Dieck estimated that the man was at the scene a few minutes and then he ran away.

Antioch Police Officer Jason Joannides was dispatched to the intersection of West 10th and E Streets about 10:05 p.m. on December 19, 2011. When he arrived he saw two vehicles in the street on West 10th Street and several people outside. He contacted Flynn who was standing west of the intersection on 10th Street between the sidewalk and her car. She was very upset and crying. Flynn said that she was beaten up by the driver of the other vehicle, and pointed toward the east sidewalk of E Street. Joannides took Flynn there, where she identified defendant, who was seated on the sidewalk, as the driver of the other car in the collision and the person who had beaten her.

Joannides observed that defendant had objective symptoms of being under the influence of alcohol. He had bloodshot, watery eyes, his speech was thick and slurred, and he smelled like alcohol. Defendant was verbally confrontational. When Joannides asked defendant for his identification, defendant attempted to get it out of his wallet, but as he did so he fell backwards on the sidewalk. Defendant told Joannides that he was on his way home from Bases Loaded bar when the car crash occurred. He claimed he only had a couple of drinks. Defendant subsequently cussed out Officer Joannides. Joannides did not perform a field sobriety test on defendant because defendant was on a gurney to be transported to the hospital. At the hospital, Joannides witnessed blood being drawn from defendant.

Officer Joannides arrested defendant for felony driving under the influence. He also arrested him for misdemeanor battery based on a citizen's arrest form filled out by Flynn at the hospital.

Antioch Police Officer Rick Martin specialized in accident investigations. On December 19, 2011, about 10:00 p.m., Martin responded to a report of a vehicle collision with injuries at the intersection of West 10th and E Streets. Martin explained that West

4

10th Street is a two lane east-west thoroughfare with no stop signs or lights between A and G Streets. E Street is a north-south street with the intersection controlled by stop signs in each direction. Martin prepared a diagram of the collision showing the positions of the cars when he arrived. Defendant's car faced east on West 10th Street and Flynn's car was on West 10th Street facing west. The driver's door on defendant's car was closed.

Martin examined the debris field and skid marks and interviewed witnesses at the scene, including Flynn, her grandson, and defendant. Defendant told Martin that he was at Bases Loaded bar, had a few drinks, and was traveling south on E Street. Defendant said that he came to a full and complete stop at the stop sign at the intersection. As he entered the intersection, he saw Flynn's vehicle coming. Defendant said he hesitated at the intersection, but he did not explain why. Flynn then collided with his car. Afterwards, he got into a verbal argument with Flynn. Defendant was upset, angry, and somewhat argumentative. He said he had neck and back pain. His eyes were bloodshot and watery, his speech seemed slow and slurred, and there was an odor of alcohol.

Martin also spoke to Heather Noonan, a passenger in defendant's vehicle. Martin testified that Noonan was "extremely intoxicated," crying, and upset. She said they had just come from Bases Loaded and defendant was driving. When asked about the details of the collision, Noonan was "basically disoriented." Martin asked if she knew where she was, and Noonan believed she was in Concord. There were several people around when he interviewed Noonan. Martin also interviewed Anthony Ascarrund, but he was not sure where Ascarrund was when he was interviewing Noonan.

Based on the debris field and the parties' statements, Martin determined that defendant was driving south on E Street and Flynn was driving west on West 10th Street when the collision occurred at the intersection of those two streets. The front of Flynn's vehicle hit the left rear quarter panel of defendant's car, causing Flynn's car to veer off and defendant's car to spin counterclockwise. The damage to the cars was consistent with this assessment.

5

Antioch Police Officer Preston Garcia interviewed Roland Dieck at the scene of the collision. Dieck identified defendant, who he claimed tried to run from the scene. Dieck said that he saw another male who did flee. Dieck lost sight of that person.

It was stipulated that a phlebotomist drew blood from defendant at 11:10 p.m. on December 19, 2011. The blood was analyzed and determined to contain .23 percent blood-alcohol content.

Joaquin Jimenez, a criminalist at the Contra Costa County sheriff's office, testified as an expert on the effects of alcohol on the human body. Jimenez explained that alcohol is a central nervous system depressant, which slows the body's ability to transmit signals from one nerve cell to another. At low levels of alcohol, a person may become talkative, euphoric, have altered judgment and decreased inhibitions. As the alcohol level gets higher, a person experiences loss of motor skills, degradation of visual ability, and an inability to handle divided attention tasks such as driving. At even higher levels, there is slurred speech, staggered gait, and further loss of motor skills and coordination. At extremely high levels, there may be loss of consciousness, paralysis, and ultimately death. Jimenez explained that people may experience the above symptoms at different levels based on their individual tolerance to alcohol, the frequency of their consumption of alcohol, and their genetics. However, despite these differences, for most people it would be unsafe to drive at .05 blood-alcohol level, and at .08 blood-alcohol level, virtually all people are too impaired to drive safely. Jimenez had no doubt that someone between .15 and .23 percent blood-alcohol level would be too impaired to drive safely. Jimenez stated that running a stop sign, failing to yield to oncoming traffic, having red watery eyes, slurred speech, and falling over while sitting are all consistent with someone being impaired by alcohol.

## B.    *Defense Case*

Heather Noonan, defendant's "significant other" for more than 20 years, was in the car on the night of the December 19, 2011 accident. She spoke with a police officer at the scene, but she was not honest with him. She told the officer that defendant had been driving at the time of the accident, but she was actually the one behind the wheel.

Defendant's brother, Anthony Ascarrund, was not around her when she spoke to the officer. However, she claimed that before talking to the police, she told Ascarrund not to tell the officer that she was driving because she did not have a license. She admitted that at a prior proceeding she said she could not remember whether she talked to Ascarrund before or after talking to the police.

According to Noonan, they had been at Bases Loaded that night watching the 49er football game. When they left, she got into the driver's seat and defendant sat in the passenger seat. Ascarrund sat behind her, and Ismael Sauceto, defendant's cousin, was behind defendant. Initially, she said that she stopped for the stop signs on E Street, but then claimed that she was driving on 10th Street. She was unable to explain how she got from Bases Loaded to 10th Street; instead, she asserted that she just followed Google maps. Noonan told the police that defendant was driving because her license had been suspended. She was not concerned about drinking; she claimed she only had one drink at Bases Loaded a couple of hours before the accident and denied she was drunk. Defendant had "a couple" of drinks.

After the collision, Noonan tried to get out of the driver's door, but it would not open. Defendant had opened the passenger door and rolled out. He was not wearing a seat belt and appeared to be in pain. Noonan was worried about him. Noonan did not know when Sauceto or Ascarrund got out of the car. Her focus was on defendant because he was injured and on the ground vomiting. He tried to get up but was stumbling. A man then pulled up and "took [defendant] down." Noonan did not know where Sauceto was and was not thinking about him. Instead, she was more concerned about defendant. She did not see Sauceto run away; he just disappeared. She knew defendant had not hit Flynn because she focused on him the whole time and never let him out of her sight. She never saw him take a swing at anyone.

The next time Noonan saw Sauceto he was in defendant's mother's car about 30 to 45 minutes after the accident. Later that night, Sauceto told Noonan he had hit the woman from the car that collided with them.

7

When asked if she called the police to turn herself in, she claimed she did one time, but it was a holiday and no one was there. She never called the insurance company or the Department of Motor Vehicles to tell them that she was the driver. She never contacted anyone, other than defendant's attorney, after defendant was charged, to claim that she had been the driver.

At trial, Noonan presented a photograph that she claimed defendant took a few days after the collision showing a bruise on her left shoulder allegedly caused by the driver's seat belt at the time of the collision. She admitted that the photo did not show her face, but only her chin. At first she denied that the photo was cut off, but when confronted with another photo, she admitted it had been cut off.

Anthony Ascarrund, defendant's brother, was 18 at the time of the collision. He had been at Bases Loaded bar with defendant, Sauceto, and Noonan watching Monday night football. After the game, they all got in the car to go home. Noonan was driving. Ascarrund was sitting behind her. He just suffered a small cut as a result of the accident. He was wearing a seat belt, but did not get bruised from it. He was able to get out of the car, but had to use the back right passenger door. Sauceto got out of the car before him. He saw Sauceto go to the right. He did not see Sauceto strike anyone. He did see Sauceto run from the scene. When asked how long after the collision Sauceto ran from the scene, Ascarrund explained, "I guess maybe like a—after he got hit, like a—not even a minute, then our car stops, then he flees."

Later, when they dropped Sauceto off at defendant's house, Sauceto told Ascarrund that he had "hit a lady." He subsequently repeated that claim.

Ascarrund admitted that on the night of the accident, he had lied to the police and told them that defendant had been driving. He claimed that before the police talked to him, he was a few feet from Noonan and heard the police interviewing her. Noonan told the police that defendant was driving. When the police turned away from her, Noonan gave Ascarrund a signal with her head and hands, convincing him to say that defendant was driving. Noonan never verbally told him what to tell the police—it was a head and hand gesture. He went along with Noonan because he respected her and she convinced

8

him. Ascarrund stated that he would lie for people he respected. Ascarrund asserted that Noonan did not appear to be drunk at the scene. He did not have anything to drink that night.

Silvina Castaneda, defendant's mother, claimed that about 10 minutes after the accident on December 19, 2011, her nephew, Ismael Sauceto, called her and told her that he punched "a guy." When she went to defendant's first court appearance, Sauceto was there. At that time he said he had punched the lady that had caused the accident.

Silvina said that she went to the accident scene that night. Sauceto was several blocks away. She saw Noonan. Noonan did not appear to have been drinking very much, but she was very nervous. When Silvina was asked if she obtained a written statement from Sauceto, she claimed she got one three-weeks to a month after the accident, but did not bring it with her to court.

Defendant testified that he was "pretty drunk" on the night of the collision. He denied that he was driving or that he beat Flynn. According to defendant, he had been at Bases Loaded bar where he had two "Long Island teas" and a shot of tequila. When he left, Noonan was driving, defendant sat in the front passenger seat, Sauceto was behind him, and Ascarrund was behind the driver. Defendant knew that Noonan had a suspended driver's license, but he chose to have her drive because she only had one drink and was not intoxicated. Ascarrund was with them and, although he had not had anything to drink, he did not have a license. Sauceto also did not have a driver's license. They drove down G Street toward the freeway and made a left on West 10th Street to go home. Defendant denied that they were driving on E Street.

Defendant was not wearing a seat belt. After the collision, defendant "stumble[d]" out of the front passenger side of the car. He had a lot of pain in his lower back and head. Defendant never saw Sauceto hit anyone or run from the scene. At first defendant said he did not remember seeing Flynn, but then stated that he may have "faintly" seen her, and told her it was her fault because she hit his car. He was "possibly" yelling at her. Defendant could not recall if Flynn's grandson was with her. He acknowledged that he was angry and did not ask if she was hurt. However, after saying it was her fault, he

9

turned away and left. He never took a swing at her. A man came by and pulled defendant down. The man told defendant to sit and defendant complied. Defendant could not recall if he tried to hit the man.

Eventually paramedics and the police arrived. Defendant denied telling a police officer that he was driving. Instead, he told the officer "we" were driving home from Bases Loaded. He also denied telling the officer he was traveling south on E Street, or that he failed to come to a complete stop at the stop sign. He did say he got in an argument with Flynn, telling her it was her fault. The officer asked him for his driver's license. Defendant did not know why the officer wanted to see it. The officer never asked him what had happened.

On cross-examination, defendant said that he got out of the passenger side of the car, stumbled, fell down, and passed out. He had no idea how long he was on the ground. The police were on the scene by the time he got up. When further questioned by the prosecutor, he stated that he did not recall if the police were there when he got up or that after he got up he went over by Flynn. He did not recall any of his relatives being around when he yelled at Flynn. Defendant also acknowledged that to get to his house at the time, one would not use the freeway entrance when going west on 10th Street. Because he was drunk, defendant could not affirmatively remember whether he told Officer Martin he was driving or if he took a swing at anyone at the crime scene. However, he was able to recall Noonan was driving, as well as where every one was seated in the car.

About a week after the collision, defendant had a conversation with Sauceto in which they talked about the accident. Sauceto said he was sorry about what he did and the situation in which he put defendant.

Defendant took the picture of Noonan's bruised shoulder. He denied he cut her face off of the photo. He admitted that the time stamp on the photos depends on the date selected by the person operating the camera.

10

## II. DISCUSSION

### A.    *No Improper Discouragement of Defense Witness*

Defendant contends his rights to due process and a fair trial were denied when the trial court harshly questioned Sauceto and discouraged him from testifying on defendant's behalf at trial. We see no interference with defendant's constitutional right to present a witness in his defense.

### 1.    *Background*

#### a.    Preliminary Hearing

At the preliminary hearing, defense counsel called Sauceto as a witness. Defense counsel informed the court that: "there is a Fifth Amendment issue and a right to an attorney issue which I have spoken to Mr. [Sauceto] about. [¶] I just really want to be clear that I have told him he has a right to an attorney and that I believe he's going to make a statement today which could incriminate him . . . . He has a right to remain silent, right to an attorney, a right to Fifth Amendment privileges. [¶] That being said, he does want to testify today."

The court asked Sauceto if he was aware that he could be subject to criminal prosecution if he made admissions against his interest; he said he was. The court informed him that he had a right to an attorney and asked if he wanted one. Sauceto said he did. The court appointed an attorney, Ms. Brewer, to represent Sauceto. Later, defense counsel stated that Sauceto was still talking to his attorney and he did not know what he was going to do. Subsequently, the court asked attorney Brewer whether it was her understanding that Sauceto intended to testify despite the potential for prosecution. Brewer stated that was not her understanding. Sauceto then took the stand and invoked his Fifth Amendment right when asked questions.

#### b.    Evidentiary Hearing

Prior to trial, the court held an evidentiary hearing pursuant to Penal Code[1] section 402 with respect to Sauceto, as well as other defense witnesses. One purpose was to

---

[1]    All further undesignated statutory references are to the Penal Code.

11

determine if they intended to invoke their right to silence. At the 402 hearing, Sauceto testified that about 10:00 p.m. on December 20, [*sic*] 2011, he was a passenger in the back seat of a car being driven by Heather Noonan when there was a collision on the left side of the car. Sauceto got out of the car and wondered who had hit them.

At that point, the trial court stopped Sauceto and the following exchange took place: "THE COURT: Just a minute. Before you say anything else, it is my understanding that you are going to admit to having done something of a criminal nature yourself. [¶] THE WITNESS: Yeah. [¶] THE COURT: And, therefore, I want you to talk to your attorney before you go any further in answering anymore questions. So Ms. Brewer is standing next to you. Will you consult with her for a minute before doing so. . . .[¶] MS. BREWER: Your Honor, can we go outside or in the back for a second? [¶] THE COURT: Yes, probably right outside the front door. [¶] [Defense Counsel]: Does the witness understand he has a right to testify or not testify? That's his choice. [¶] MS. BREWER: As his attorney, I will be advising him of what his rights are."

The record reflects that Sauceto and attorney Brewer did confer. The court then asked Sauceto if he was going to answer the remaining questions, and he replied, "Yeah." Brewer then said, "Your Honor, I would just like to state that my client is going to testify against advice of his counsel. He has been informed of the possible felony crimes he could be charged with. He's also been informed that the legal maximum for those crimes is state prison with a three-years eight-months if it's two, or just three if it's one."

The following exchange then occurred: "THE COURT: Okay. And you understand that? [¶] THE WITNESS: Yeah. [¶] THE COURT: And that's alright with you? [¶] THE WITNESS: No choice. [¶] THE COURT: You do have a choice. That's why we're sitting here. [¶] THE WITNESS: Okay. [¶] THE COURT: So, is that alright with you? [¶] THE WITNESS: Yeah. [¶] THE COURT: All right. So, you're going to go ahead and answer the rest of the questions? [¶] THE WITNESS: Yes. [¶] THE COURT: Okay. Go ahead."

Defense counsel then asked Sauceto if he was intoxicated the night of the accident, and he answered, yes. Counsel asked, "When you exited the vehicle after the accident,

12

did you strike a woman named Ms. Flynn?" Sauceto replied, "Yes." On cross-examination, Sauceto stated that when he previously told the judge that he had no choice about testifying, he meant that he "did do it." He admitted that he had left the scene, but maintained that he walked away. He denied he had left the scene to get away from the police; he was just walking away. At this point, the trial court interrupted and asked Sauceto if he was aware there was a child in the car and that he could be charged with child endangerment. Sauceto testified that he did not know there had been a child in Flynn's car or that he could be charged with child endangerment. The court then asked Sauceto the following: "THE COURT: Do you know you could be charged with child endangerment if you knew a child was in that car? [¶] THE WITNESS: I didn't know there was a child. [¶] THE COURT: That's what you said. Do you know that you could be charged with child endangerment? [¶] THE WITNESS: Yeah. [¶] THE COURT: That's another felony. Do you know that? Do you? [¶] THE WITNESS: Do I know that? No. [¶] THE COURT: Do you know that now? [¶] THE WITNESS: Yeah. [¶] THE COURT: All right. Do you still want to testify?"

Defense counsel interrupted before Sauceto could answer, and asked the court "is [this] a proper line of questioning?" The court responded, "Well, I wouldn't have asked it if I didn't think so. Let's just see what the answer is." The following exchange ensued: "THE WITNESS: When that occurred, she was standing up. [¶] THE COURT: I'm asking you, do you realize that there's a child in the car, and if you knew that when you hit her, you could be charged with child endangerment? Causing the child to witness an emotionally traumatic incident is considered child endangerment. [¶] THE WITNESS: Yes. [¶] THE COURT: And you still want to testify? You could talk to your lawyer for a minute if you want."

After Sauceto conferred with his attorney, the court said, "I was advising you about the possible child endangerment. What was your answer to that?" At that point, Sauceto responded, "I testify no further." Sauceto's attorney advised the court that "He wants to invoke at this time." The court inquired and clarified that Sauceto was taking

13

the position that any further testimony "might incriminate" him and that he did not intend to testify on behalf of the defense.

c.    Mistrial Motion

After all the witnesses had testified at trial, defendant moved for a mistrial, claiming that the prosecutor and court had improperly intimidated Sauceto, resulting in his refusal to testify. Counsel argued that defendant was denied his right to a fair trial under the Fifth, Sixth, and Fourteenth Amendments.

The court pointed out that both trial counsel and the prosecutor had expected Sauceto to testify at the preliminary hearing, but instead he invoked his Fifth Amendment right to silence. Defense counsel agreed that one reason it was suggested that the trial court hold the pretrial hearing for Sauceto was to determine if he was actually going to testify or invoke his right to silence. The court did not know if a possible child endangerment charge caused Sauceto to change his mind, or if he just changed his mind like he did at the preliminary hearing. The court observed that even if the mention of a possible child endangerment charge did cause Sauceto to change his mind, looking at the totality of the case, not one witness identified Sauceto as the person who had hit Flynn, including defendant's witnesses. The only affirmative evidence on who hit Flynn was Flynn herself and Matthew. Therefore, the court did not agree that Sauceto's proposed testimony was "consistent with the truth" as counsel asserted. The court agreed that Sauceto's testimony would have been helpful to defendant, but that it was up to Sauceto whether he wished to testify. The court found it hard to believe that a misdemeanor child endangerment charge would have meant more to Sauceto than the possible felonies he faced. In any case, the court noted that it had allowed defendant's other witnesses to testify to Sauceto's hearsay statements, in which he claimed he hit a woman, on the theory that they were against Sauceto's penal interests. The court noted that the situation was problematic since there was no way to cross-examine the alleged statements. The court further observed that defendant's mother initially said that Sauceto told her he hit "a guy." It was only after the charges were read with a female name that she said he punched a lady. Finally, the court said it understood that counsel believed defendant was

14

prejudiced by not having the actual person testify. However, the court noted that Sauceto had not been thoroughly cross-examined, and if he had been in front of the jury with complete cross-examination, it could have been worse. Thus, the court did not believe that Sauceto's testimony was necessarily consistent with the truth as counsel claimed, and did not believe defendant was prejudiced because the evidence that Sauceto confessed to hitting the woman was admitted into evidence by the other witnesses rather than Sauceto himself.

In denying the mistrial motion, the trial court commented that Sauceto had "flaked out" on the defense at the preliminary hearing, and it was not surprising he did it again, and that it was Sauceto's choice whether to testify. The court also emphasized that the gist of Sauceto's testimony was before the jury through other witnesses.

*2.       Analysis*

A defendant has a right to present witnesses in his own defense. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302; *Webb v. Texas* (1972) 409 U.S. 95, 98 (*Webb*); *In re Martin* (1987) 44 Cal.3d 1, 29.) "[T]he right of an accused to have compulsory process for obtaining witnesses in his favor, guaranteed in federal trials by the Sixth Amendment, is so fundamental and essential to a fair trial that it is incorporated in the Due Process Clause of the Fourteenth Amendment." (*Washington v. Texas* (1967) 388 U.S. 14, 17-18, fn. omitted.) "The right to compulsory process is independently guaranteed by the California Constitution. In the words of article I, section 15, 'The defendant in a criminal cause has the right . . . to compel attendance of witnesses in the defendant's behalf . . . .' " (*In re Martin, supra,* 44 Cal.3d at p. 30.)

"A defendant's constitutional right to compulsory process is violated when the government interferes with the exercise of his right to present witnesses on his own behalf. [Citations.]" (*In re Martin, supra,* 44 Cal.3d at p. 30.) Thus, this basic right is violated whenever the prosecutor or the trial court intimidates a witness. (See *Webb, supra,* 409 U.S. at p. 98.) To demonstrate a violation of this right, a defendant must show that the trial court committed misconduct by "engag[ing] in activity that was wholly unnecessary to the proper performance of [its] duties and of such a character as 'to

15

transform [a defense witness] from a willing witness to one who would refuse to testify . . . .' [Citations.]" (*In re Martin, supra,* 44 Cal.3d at p. 31.) It must also be shown that there is "a causal link between the misconduct and [the defendant's] inability to present witnesses on his own behalf." (*Ibid.*) In addition, defendant " 'must at least make some plausible showing of how [the] testimony [of the witness] would have been both material and favorable to his defense.' [Citation.]" (*Id.* at p. 32.)

It is entirely proper, however, for a prosecutor or a trial court to warn a witness of the risk of self-incrimination and his Fifth Amendment rights. (*People v. Bryant* (1984) 157 Cal.App.3d 582, 591-592; see *People v. Schroeder* (1991) 227 Cal.App.3d 784, 787–788 (*Schroeder*).) Indeed, "when a trial court has reason to believe that a witness may be charged with a crime arising out of events to which he might testify, it has a duty to insure that the witness is fully advised of his privilege against self-incrimination. [Citation.]" (*People v. Warren* (1984) 161 Cal.App.3d 961, 972, fn. omitted.) The court may advise the witness or appoint counsel to advise the witness. (*Schroeder, supra,* 227 Cal.App.3d at p. 788.) When the court undertakes to inform the witness of his or her privilege against self-incrimination, "it 'must walk the fine line between, on the one hand, fully advising the witness of the danger of self-incrimination and the right not to testify, and, on the other hand, threatening the witness to an extent which materially impairs the defendant's due process right to present witnesses in his [or her] defense.' [Citation.]" (*Schroeder, supra,* 227 Cal.App.3d at p. 789.)

Defendant compares the court's questioning of Sauceto to the trial court's conduct in *Schroeder.* There, the defendant sought to introduce the testimony of a woman who was also involved in the crimes charged against him and was currently awaiting sentencing after entering a " 'conditional plea.' " (*People v. Schroeder, supra,* 227 Cal.App.3d at p. 787.) The woman appeared with her attorney, had consulted with him, knew about her privilege against self-incrimination, was advised against testifying, yet appeared willing to testify. (*Id.* at pp. 787.) The court proceeded to question the woman repeatedly whether she understood her right to refuse to testify, her attorney had advised her to remain silent, and that her testimony could negatively impact her plea agreement.

16

(*Id.* at p. 787-792.) At one point, the court said, " 'I have never yet seen at least—I might be seeing it today, a client fail to follow her attorney's advise [*sic*] when advised that answers he or she may give could result in he or she being incriminated in that those questions can be used against you, . . . in your own case . . . . [¶] . . . [¶] . . . I don't know if it means your plea being accepted or rejected, or whether or not you end up going to prison or not.' " (*Id.* at pp. 789-790.) The court continued to reiterate to the witness that her counsel believed that testifying was not in her best interests. (*Id.* at p. 790.) After some questions from the witness, the court advised the witness that her only duty pursuant to the subpoena was to come to court; she could refuse to answer questions. (*Id.* at pp. 790-791.) The court stated, " 'You've got no burden to do anything beyond that.' " (*Id.* at p. 791.) The court advised the witness that anything she said that day could be used against her in further proceedings. (*Ibid.*) The court continued: " 'But the thing is you are going to decide one way or another whether or not you want to take a lawyer's advice or handle it yourself. [¶] You know, you can also decide whether or not you want to have brain surgery . . . or leave it up to a neurosurgeon. You know, you can decide, well, you think you're okay so you're not going to have brain surgery, or you can leave it up to a neurosurgeon to advise you because they're trained in that field. It's kind of similar to that.' " (*Id.* at p. 792.) Defense counsel objected to the analogy and suggested that the discussions could result in coercing or intimidating the witness. (*Ibid.*) The court suggested that the witness confer with her counsel again, but her counsel said they had discussed everything already. (*Ibid.*) The court then asked the witness if she wanted to follow counsel's advice or not. (*Id.* at p. 793.) She replied, " 'I guess I don't want brain surgery, so yes, I do. I guess. If that's his strict advice then I have to follow it.' " (*Ibid.*)

The appellate court found error, stating: "This lengthy interchange makes it clear that the trial court exceeded its duty simply to ensure the witness was fully apprised of her privilege against self-incrimination. She was so advised and expressed her desire to testify. At this point, the court had no duty, and no right, to prevent a willing witness from incriminating herself or to convince her to follow her attorney's advice not to

17

testify. Yet, the trial court in essence became an advocate repeatedly cautioning [the witness] about the folly of her decision. Even after defense counsel expressed concern that the court's comments were bordering on coercion and intimidation, the court persisted. [¶] Not only were the court's actions wholly unnecessary to the proper discharge of its duties, they unquestionably were coercive in context. Simply by the nature of the proceedings, the court's words carried an intimidating force. This is particularly so here since [the witness] had entered a plea in her case and may have been wary of doing anything which might displease the court. By its frequent interruptions, admonishments and questions, the court inappropriately made clear to [the witness] that it disagreed with her intended action and felt that she should not testify." (*Schroeder, supra,* 227 Cal.App.3d at p. 793.)

The facts of the present case are distinguishable from *Schroeder*. Here, the trial court fulfilled its duty to ensure that the witness was properly advised of his privilege against self-incrimination and his right not to testify. The advisement was not extensive or heavy-handed. And, although Sauceto had spoken to his attorney, he was unaware of the possible child endangerment charges, a point the court clarified by noting that a child was present at the scene. When Sauceto realized that a child was present and that he could face endangerment charges in addition to the other charges, he chose not to testify. The court did not overstep the bounds of permissible intervention by ensuring that Sauceto was fully aware of the possible dangers of self-incrimination. Unlike in *Schroeder*, nothing suggests that Sauceto felt that he had no choice but to assert his Fifth Amendment rights.

Defendant contends that the court's questioning was "calculated to discourage" Sauceto from testifying on his behalf. He seeks to characterize the questioning of Sauceto as "confrontational and argumentative," which ultimately "frightened" Sauceto into changing his mind about testifying at trial. But on this record, without the benefit of viewing the witness's demeanor, we cannot agree with defendant's assessment of the effect of the court's questioning on Sauceto. Contrary to defendant's assertion, nothing in the record indicates the judge intimidated Sauceto.

18

Equally unpersuasive is defendant's reliance on cases in which the court or the prosecution threatened the sole defense witnesses with perjury charges if they testified.

For example, in *Webb,* the trial court, on its own initiative admonished the sole defense witness as follow: " 'Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood [*sic*] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.' " (*Webb, supra,* 409 U.S. at pp. 95-96.)

The Supreme Court concluded that the trial court deprived the defendant of due process by driving his sole witness off the stand. "The trial judge gratuitously singled out this one witness for a lengthy admonition on the dangers of perjury. But the judge did not stop at warning the witness of his right to refuse to testify and of the necessity to tell the truth. Instead, the judge implied that he expected [the witness] to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances for parole." (*Id*. at p. 97, fn. omitted.)

Similarly, in *People v. Bryant* (1984) 157 Cal.App.3d 582, the prosecutor informed the sole defense witness at a probation revocation hearing that he would prosecute the witness for perjury if he testified in accordance with his testimony at the

19

preliminary hearing. (*Id.* at 588.) The prosecutor advised the court that he was already "personally prosecuting" the witness for his alleged perjury at the preliminary hearing. (*Ibid.*) Once the witness was sworn, the prosecutor stated that he " 'would like to inform [the witness] . . . that if he . . . testifies . . . essentially [to] the same things . . . he did before, in [his] opinion that again would be perjury and [the witness] would be facing another count.' " (*Id.* at p. 589, fn. omitted.) On appeal, the court concluded that the defendant had been denied a fair trial, explaining that the prosecutor's "statement went far beyond reminding the witness of the duty to tell the truth or advising him of the consequences of perjured testimony, and in fact revealed the prosecutor's 'expectation' that the witness' testimony would be perjurious if favorable to appellant, as was his preliminary hearing testimony." (*Bryant, supra,* 157 Cal.App.3d p. 589.)

Here, unlike in *Webb* and *Bryant*, no threats or coercive action "effectively drove [the] witness off the stand." (*Webb, supra,* 408 U.S. at p. 98; *Bryant, supra,* 157 Cal.App.3d at p. 593.)

Nevertheless, even if some of the trial court's warnings crossed the line, any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.) As the trial court noted, Sauceto's claim that he was the one who hit the lady in the other car was brought before the jury through the testimony of four defense witnesses—defendant's mother, Noonan, Ascarrund, and defendant himself. Moreover, because it was brought in through hearsay, there was no way for the prosecutor to cross-examine Sauceto, which would likely have been damaging to defendant. Thus, defendant had the benefit of the alleged admission of Sauceto going before the jury without the risks inherent in cross-examination.

Also, given the totality of evidence, Sauceto's claim was simply not believable. Flynn testified that after the collision, she saw a man get out of the *driver's side* of the other car. Yet, defendant's witnesses testified that Sauceto was in the back seat on the passenger side, not driver's side. Both Flynn and her grandson identified defendant as the assailant. Also, Dieck, the good Samaritan who stopped to help Flynn, said that he heard her yelling that someone was hitting her. Although Flynn was no longer being

20

beaten as Dieck approached, defendant, who was drunk and belligerent, was nearby and took a swing at Dieck. None of these witnesses had any motive to lie.

All of defendant's witnesses, on the other hand, were close relatives who gave inconsistent and contradictory stories lacking in any credibility. Defendant admitted that he had argued with Flynn, but denied he had hit her. None of the defense witnesses saw anyone hit Flynn. Rather, their testimony that Sauceto hit Flynn was based on hearsay statements they claimed Sauceto made. Ascarrund's testimony however negated the possibility that Sauceto could have hit Flynn. Ascarrund got out of the car behind Sauceto, and saw Sauceto running from the scene. When asked how long after the collision Sauceto ran from the scene, Ascarrund testified "after [they] got hit, like a . . . not even a minute, *then our car stops, then he flees*." (Italics added.) Noonan said she knew defendant did not hit Flynn because she never took her eyes off him. Yet, she never saw defendant argue with Flynn; a fact defendant admitted. Despite the officer at the scene describing her as extremely intoxicated and disoriented, she maintained that she only had one drink during the several hours she was at the bar and that she was sober. Also, even though she professed to be concerned for defendant's well-being, she told police at the scene that he had been the driver. Later, she claimed that she had lied to the police, and that she actually was the driver.

Ascarrund, defendant's brother, also had little credibility. He told the police that defendant was driving, yet at trial maintained that Noonan was driving. He claimed that he lied to police only because he was right by Noonan when the police were questioning her, that he heard her say that defendant was driving, and that she then "convinced" him through hand and head gestures to tell the police that appellant was driving. Ascarrund testified that he was willing to lie for people he respected.

Ascarrund's testimony also contradicted Noonan's version of the events. Noonan testified that Ascarrund was not near her when she was talking to the police, while Ascarrund testified he was right by her. Moreover, Noonan claimed that she verbally told Ascarrund to say that defendant was driving, while Ascarrund testified that Noonan never actually verbally told him to do so, but just made hand and head gestures.

21

Defendant's mother also was not credible. In fact, she initially said that Sauceto told her that he hit a "guy." Only after hearing the victim's name, did she refer to a "lady" being hit. Defendant's mother claimed that she got a written statement from Sauceto about what he did, but did not have it with her. There was no evidence that she ever told anyone about such a written statement. Moreover, she never came forward to tell the police or the prosecutor about what Sauceto said, despite her own son being accused of the assault.

Finally, defendant himself was not credible. He admitted that he was extremely drunk that night. Whenever confronted on cross-examination with undisputed facts or inconsistencies in his statements, he claimed he could not remember because of his extreme intoxication. Yet, he was able to clearly remember that he was not driving and that he never hit or tried to hit Flynn.

Even overlooking the numerous inconsistencies in the testimony of the defense witnesses, the theory of the defense was at best farfetched. Although defendant was purportedly neither the driver of the car nor the assailant who beat Flynn, his family, including his significant other of 20 years and his mother, were initially content to wait to allow him to take the fall for Noonan and Sauceto.

In sum, given the overwhelming evidence of defendant's guilt, together with the implausible and inconsistent claims by defendant and his witnesses, any error in the exclusion of Sauceto as a witness was harmless beyond a reasonable doubt.

### B.     *Aggravated Assault is Not a Lesser Included Offense of Simple Battery*

Defendant contends that he could not properly be convicted of both the assault upon Flynn, as well as for the battery against her. He argues that his assault conviction must be reversed because it is impossible to commit a battery without assaulting the victim. Thus, he contends that assault is a necessarily included offense of the battery.

A lesser offense is necessarily included within a greater offense if the greater offense cannot be committed without also committing the lesser offense. (*People v. Reed* (2006) 38 Cal.4th 1224, 1227.) Simple assault is a lesser included offense of battery

because an assault is "nothing more than an attempted battery." (*People v. Fuller* (1975) 53 Cal.App.3d 417, 421.)  Battery requires a touching of the victim; the least touching suffices and infliction of injury is not necessary.  (*People v. Marshall* (1997) 15 Cal.4th 1, 38; *People v. Colantuono* (1994) 7 Cal.4th 206, 214, fn. 4.)  Assault is complete upon the initiation of force towards the victim when the next movement will likely cause a battery, even if no touching occurs. (*People v. Colantuono, supra,* 7 Cal.4th at pp. 216–217; *People v. Page* (2004) 123 Cal.App.4th 1466, 1473.)

Defendant's argument on appeal would have some merit if he had been convicted of *simple* assault and battery.  Here, however, defendant was charged with and convicted of aggravated assault (§ 245, subd. (a)(1) assault with a deadly weapon [fists]) and misdemeanor battery (§ 242, 243, subd. (a)).  "Our penal statutes prohibiting crimes against the person carry a common theme of correlating increased punishment with the culpability of the offender in terms of his mental state and the means used rather than the gravity of the result.  This is consistent with the deterrent theory underlying all penal statutes.  Thus 'simple' battery is always punishable as a misdemeanor with a maximum of six months in jail no matter how serious the injury.  A similar punishment is prescribed for 'simple' assault.

"The California Legislature, however, in keeping with the theme of increased punishment for increased culpability and consistent with the concept of deterrence, instead of creating a crime of 'aggravated battery' has, as in most jurisdictions, created the crime of 'aggravated assault' by providing that one who attempts to commit a more serious injury by the use of a deadly weapon or means of force likely to produce great bodily injury shall be punished as a felon for from six months to life or as a misdemeanant with a sentence of up to one year in the county jail, ([ ] § 245) regardless of whether injury is actually inflicted. [Citation.]  It could not have been the legislative intent in imposing such severe punishment as a possible life sentence for assault with a deadly weapon that if injury was in fact inflicted the crime would be reduced to simple battery.  [¶]  Battery is not an included offense in the crime of assault with a deadly weapon [citation] and patently assault with a deadly weapon is neither a lesser nor

included offense in battery. The test of whether an offense is included in another is whether the one offense can be committed without necessarily committing the other. [Citations.] A person can commit battery without using a deadly weapon or means likely to produce great bodily harm. While an aggravated assault in violation of . . . section 245 and battery both include the elements of a simple assault, a violation of .[ ] section 245 is a greater offense than and separate and distinct from either simple assault or battery." (*People v. Fuller, supra,* 53 Cal. App. 3d at pp. 421-422.)

Moreover, in addition to being distinct from simple assault and simple battery, aggravated assault is also distinguishable from felony battery. In *In re Ronnie N.* (1985) 174 Cal.App.3d 731, 735 (*Ronnie N.*), the court squarely held that aggravated assault is not a necessarily lesser included offense of felony battery because "a battery inflicting serious injury could occur without necessarily using a weapon or force likely to cause such serious injury." (Italics omitted.) Drawing upon *People v. Bertoldo* (1978) 77 Cal.App.3d 627, 633-634, the *Ronnie N.* court gave the example of " 'a push that results in a fall and concomitant serious injury,' " which would be " 'triable as felony battery' " even though it may not entail "sufficient deadly force to permit successful prosecution" for aggravated assault "under section 245, subdivision (a)." (*Ronnie N., supra,* 174 Cal.App.3d at p. 735.)

Thus, it follows that when an individual commits an assault in violation of section 245 and is successful in inflicting injury upon his victim he may be convicted of both the aggravated assault and simple battery even though, as we shall explain *post*, section 654 may bar multiple punishment. (*People v. Fuller, supra,* 53 Cal.App.3d at p. 420.)

## C.    *Sentencing*

Alternatively, defendant contends that even if his convictions for both assault and battery are proper, he cannot be punished for both offenses. He maintains that his assault conviction is the offense that must be stayed. We disagree.

Section 654, subdivision (a) (section 654) provides that an act or omission punishable in different ways by different provisions of law "shall be punished under the

24

provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

Whether a course of criminal conduct is divisible and gives rise to more than one act under section 654 depends on the intent and objective of the defendant. If all the offenses were incident to one objective, the defendant may be punished for any one of the offenses, but not for more than one. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208; *People v. Beamon* (1973) 8 Cal.3d 625, 637; *People v. Perez* (1979) 23 Cal.3d 545, 551 [if defendant entertained multiple criminal objectives independent of and not merely incidental to each other, he may be punished for each].)

Here, the trial court sentenced defendant to a two-year prison term for the aggravated assault. It imposed a concurrent one-year term for the misdemeanor battery. Clearly, the aggravated assault and misdemeanor battery of Flynn arose during the same course conduct and they were committed with same criminal objective, for which there can be but one punishment. (§ 654.) Since defendant was sentenced, albeit concurrently, on two separate convictions, one of those sentences must be stayed. (See *People v. Fuller, supra,* 53 Cal.App.3d at p. 420.) "The usual procedure in such situations is to leave standing the sentence for the most serious offense of which defendant convicted. [Citations.]" (*Ibid.*) In the instant case, the most serious offense that defendant committed was that of aggravated assault. (*Id.* at p. 421.)

Thus, the sentence for aggravated assault is the one that should stand and the sentence for misdemeanor battery should stayed. We shall order the abstract of judgment be modified accordingly.[2]

### III. DISPOSITION

The abstract of judgment is modified to reflect that the one-year concurrent term for sentence on count four for misdemeanor battery (§§ 242, 243, subd. (a)) is stayed pursuant to section 654. The superior court is directed to prepare and forward a copy of

---

[2] We also note that the abstract of judgment erroneously lists the battery offense as count five, instead of count four as charged in the information.

the amended abstract of judgment to the Department of Corrections and Rehabilitation. As so modified, the judgment is affirmed.

_____
REARDON, J.


We concur:


_____
RUVOLO, P. J.


_____
RIVERA, J.